**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of<br><br>FOURWORLD EVENT OPPORTUNITIES, LP and GENESIS EMERGING MARKETS INVESTMENT COMPANY<br><br>Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 22- |

## MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Duane L. Loft
Andrew P. Steinmetz
Brianna S. Hills
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2380
dloft@bsfllp.com
asteinmetz@bsfllp.com
bhills@bsfllp.com

Ira A. Schochet
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0864
ischochet@labaton.com

Christine Mackintosh (*pro hac vice* application forthcoming)
123 S. Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7081
cmackintosh@gelaw.com

*Attorneys for Petitioners*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ II

EX PARTE APPLICATION ................................................................................ 1

FACTUAL BACKGROUND ............................................................................. 4

    A.    Parties to the Foreign Proceeding .......................................................... 4

    B.    The Merger ............................................................................................. 4

    C.    The Merger's Unfair Price and Process ................................................ 8

    D.    Petitioners' Cayman Islands Appraisal Proceeding ............................. 10

    E.    Discovery in the Cayman Islands Appraisal Proceeding ..................... 11

    F.    Respondents and the Discovery Sought ............................................... 12

ARGUMENT ................................................................................................... 13

I.    The Application Satisfies the Three Statutory Requirements of 28 U.S.C. 1782. ........... 14

    A.    Respondent "Resides" or Is "Found in" this District. .......................... 14

    B.    The Discovery Sought Is "For Use" In a Foreign Proceeding. ............. 15

    C.    Petitioners Are "Interested Persons." .................................................. 16

II.    The *Intel* Discretionary Factors Weigh in Favor of Granting Discovery. ....................... 17

    A.    Respondents Are Non-Participants in the Appraisal Proceeding. ........ 17

    B.    The Cayman Islands Court Will Be Receptive to the Evidence Sought. .............. 18

    C.    Petitioners Are Not Circumventing Foreign Proof-Gathering Restrictions. ......... 19

    D.    The Subpoenas Are Not Unduly Burdensome. .................................... 20

        1.    The Subpoenas Only Seek Non-Privileged Discovery. ........................ 20

        2.    The Subpoenas Are Properly Limited in Scope. ................................... 23

        3.    A Rule 30(b)(6) Deposition Is Appropriate Here. ................................ 24

III.    Expedited Compliance with the Subpoenas Is Warranted. .............................................. 25

CONCLUSION ................................................................................................ 25

**TABLE OF AUTHORITIES**

## CASES

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
   785 F.Supp.2d 434 (S.D.N.Y. 2011)...........................................................................18, 21

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   305 F.3d 120 (2d Cir. 2002) ...................................................................................16

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) .................................................................................17, 21

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)...................................................................................16

*Diversified Grp. Inc. v. Daugerdas*,
   304 F. Supp. 2d 507 (S.D.N.Y. 2003)...................................................................26

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995) .............................................................................20, 28

*First Am. Corp. v. Price Waterhouse LLP*,
   154 F.3d 16 (2d Cir. 1998) ...................................................................................28

*Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assocs. CHTD*,
   538 F. Supp. 3d 21 (D.D.C. 2021) ........................................................................23

*Gushlak v. Gushlak*,
   486 F. App'x 215 (2d Cir. 2012) ...........................................................................21

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017) .............................................................................14, 17

*In re Accent Delight Int'l Ltd.*,
   Nos. 16-MC-126 (JMF), 18-MC-50 (JMF), 2018 WL 2849724 (S.D.N.Y. June 11, 2018).....28

*In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*,
   No. 12 MC 221 (RPP), 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ...................................20

*In re Appl. of Imanagement Servs. Ltd.*,
   No. Misc. 05-89 (FB), 2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005) ...................................22

*In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*,
   No. M 10-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) .........................................20

*In re Appl. of Temporary Services Ins. Ltd.*,

2009 WL 2843258 (W.D.N.Y Aug. 28, 2009) .......................................................................18

*In re Application of Athos Asia Event Driven Master Fund*,
No. 1:21-MC-00208-GBF, ECF 8 (S.D.N.Y. Mar. 3, 2021) ...................................................21

*In re Application of Athos Asia Event Driver Master Fund*,
No. 4:21-MC-00153-AGF, 2021 WL 1611673 (E.D. Mo. Apr. 26, 2021) .............................21

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998) ............................................................................................2, 22

*In re Chevron Corp.*,
749 F. Supp. 2d 141 (S.D.N.Y. 2010) ..................................................................................25

*In re del Valle Ruiz,*
939 F.3d 520 (2d Cir. 2019) .....................................................................................4, 15, 22

*In re Ex Parte Application of Porsche Automobil Holding SE*,
No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ...................................28

*In re FourWorld Event Opportunities*,
No. 1:21-mc-00283-RGA (D. Del., filed July 23, 2021) ......................................................20

*In re FourWorld Event Opportunities*,
No. 1:21-mc-00543-PKC (S.D.N.Y., filed July 23, 2021) ....................................................20

*In re FourWorld Event Opportunities*,
No. 1:22-mc-00018-TNM (D.D.C., filed Feb. 3, 2022) ........................................................21

*In re FourWorld Event Opportunities*,
No. 1:22-mc-91099-IT (D. Mass., filed Feb. 3, 2022) .........................................................21

*In re FourWorld Event Opportunities*,
No. 2:21-mc-019 CAS JPR (C.D. Cal., filed July 23, 2021) .................................................20

*In re FourWorld Event Opportunities*,
No. 2:22-mc-00022 (C.D. Cal., filed Feb. 2, 2022) .............................................................21

*In re Gushlak*,
No. 11–MC–218 (NGG), 2011 WL 3651268 (E.D.N.Y. Aug. 17, 2011) ...............................27

*In re Iraq Telecom Ltd.*,
2021 WL 5177603 (E.D. Pa. Nov. 5, 2021) .....................................................................23, 24

*In re Iraq Telecom*,
No. 2:19-mc-175 (RBS), ECF 24 (Dec. 15, 2020) ..............................................................24

*In re Letter of Request from Supreme Ct. of Hong Kong*,
138 F.R.D. 27 (S.D.N.Y. 1991) ...........................................................................................28

*In re Metallgesellschaft AG*,
   121 F.3d 77 (2d Cir. 1997) .................................................22

*In re Mother's Milk, Inc.*,
   No. 5:20–MC-00004–M, 2020 WL 2514315 (S.D.N.Y. May 15, 2020)................................28

*In re Penner*,
   2017 WL 5632658 (D. Mass. Nov. 22, 2017) ........................................21

*In re Petrobras Securities Litig.*,
   393 F. Supp. 3d 376 (S.D.N.Y. 2019) ..................................................15

*In re Platinum Partners Value Arbitrage Fund L.P.*,
   583 B.R. 803 (Bankr. S.D.N.Y. 2018) ................................................21

*In re Top Matrix Holdings Ltd.*,
   No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ...............................4, 19

*In re Veiga*,
   746 F. Supp. 2d 8 (D.D.C. 2010) ..........................................................2, 23

*In The Matter of Nord Anglia Education, Inc.*,
   FSD 235 OF 2017 ...........................................................................3

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ...............................................................passim

*Marubeni Am. Corp. v. LBA Y.K.*,
   No. 08-3282-CV, 335 F. App'x 95 (2d Cir. June 17, 2009) ....................................14

*Matter of Degens*, No. 20-mc-237 (JGK) (RWL),
   2020 WL 4252725 (S.D.N.Y. July 24, 2020) ........................................22, 25

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ...................................................... 15, 17, 18

*Pearson v. Trinklein*,
   No. 21-MC-770 (ALC) (JLC), 2022 WL 1315611 (S.D.N.Y. May 3, 2022) .........................23

*Qihoo 360 Technology Co., Ltd.*,
   (unreported, October 9, 2017 CICA) ..................................................17

*Ratliff v. Davis Polk & Wardwell*,
   354 F.3d 165 (2003) ........................................................................23

*Strike 3 Holdings, LLC v. Doe*,
   No. 20–cv–7923 (LJL), 2020 WL 5992346 (S.D.N.Y. Oct. 9, 2020) .....................................28

*United States v. Ackert*,

169 F.3d 136 (2d Cir. 1999) ............................................................................................24, 25

*Walden v. Fiore*,
 571 U.S. 277 (2014)..............................................................................................................15

**STATUTES**

28 U.S.C. § 1782.......................................................................................................... 1, 14, 15

## EX PARTE APPLICATION

Petitioners respectfully submit this *ex parte* Application pursuant to 28 U.S.C. § 1782 to take limited discovery from entities found in this District for use in connection with an appraisal proceeding filed in the Grand Court of the Cayman Islands (the "**Cayman Court**") on November 10, 2020 (the "**Appraisal Proceeding**"). In the Appraisal Proceeding, Petitioners (along with other dissenting shareholders) seek a determination of the fair value of their former shareholdings in 58.com ("**58.com**" or the "**Company**"), a Cayman Islands company that was delisted from the New York Stock Exchange, and taken private on September 17, 2020. Petitioners' shares were forcibly canceled through a merger orchestrated by the Company's CEO and several private-equity funds (the "**Merger**").

The Merger was coercive and fundamentally unfair to minority shareholders, with respect to both the Merger price, which significantly undervalued 58.com's shares, and the process to approve the Merger. The Merger capitalized on a temporary decline in 58.com's trading prices during the COVID-19 pandemic. No effort was undertaken to shop the Company to competing bidders to ensure that 58.com shareholders received fair value for their shares. And the Merger was orchestrated by majority shareholders—including the Company's founder and CEO—without the consent of a substantial amount of minority shareholders, who were offered inadequate consideration for their shares.

Through this Application, Petitioners seek narrowly tailored discovery (the "**Requested Discovery**") from Fenwick & West LLP ("**Fenwick**") and Morrow Sodali International LLC ("**Morrow Sodali**" or, together, the "**Respondents**"). Fenwick acted as legal counsel for a special committee of independent members of the 58.com board of directors tasked with considering the Merger (the "**Special Committee**"). Petitioners seek Fenwick's non-privileged communications with counterparties to the Merger, including the Buyer Group, and with other parties involved in

1

the Merger that are outside of any attorney-client relationship with the special committee. Morrow Sodali, a shareholder engagement and governance consulting firm, acted as the proxy solicitor for the Company in this Merger. Petitioners seek discovery from Morrow Sodali that will aid in establishing the Company's strategy for obtaining shareholder support for the Merger and in addressing dissenting shareholders. All of this discovery is relevant to the Appraisal Proceeding, in which the Cayman Court will examine both the fairness of the Merger consideration and also the process undertaken by the Company to approve the Merger.

Section 1782 authorizes this Court to order discovery from any person that resides or is found in this district to assist with pending or contemplated proceedings before foreign tribunals. Section 1782's broad applicability and "modest prima facie elements" reflect "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).[1]  Petitioners' Application meets all of the statutory requirements of Section 1782: (i) Respondents "reside[] or [are] found" in this District; (ii) the Requested Discovery is "for use" in a foreign proceeding, namely the Appraisal Proceeding; and (iii) Petitioners, each of which is a party to the Appraisal Proceeding, easily meet the standard for an "interested person" under the statute. In addition, each of the Supreme Court's factors that guide this Court's exercise of discretion under Section 1782 weighs decisively in favor of granting Petitioners' Application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) ("*Intel*").

*First*, Petitioners seek discovery from a "nonparticipant" in the foreign action. *Id.* Respondents are not parties in the Appraisal Proceeding or otherwise subject to the jurisdiction of the Cayman Court.

---

[1] *See also In re Veiga*, 746 F. Supp. 2d 8, 24 (D.D.C. 2010) (pointing to "the statute's overarching interest in providing fair and efficient assistance and the liberal standards of discovery in granting the application and deferring to the foreign tribunal on contested issues").

*Second*, there is no indication, let alone the required "authoritative proof," suggesting that the Cayman Court might be unreceptive to Section 1782 assistance. *Id.* To the contrary, as established in the accompanying expert declaration of Justice Ingrid Mangatal (Ret'd), Petitioners will have the right to present evidence gathered under Section 1782 to the Cayman Court in support of their claims. Indeed, as made clear in a recent Cayman Islands appraisal decision, *In The Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017,[2] the Cayman Court will accept and consider the evidence sought here given its critical importance in determining the fair value of the shares.

*Third,* the Application is not concealing any improper attempt to circumvent any foreign discovery restrictions on proof gathering. *Intel*, 542 U.S. at 264. The requested discovery does not implicate any privilege or special protection that would make it improper under Cayman Islands law.

*Fourth*, the proposed discovery is not unduly burdensome. *Id.* To the contrary, the subpoenas (the "**Subpoenas**") are narrowly tailored to seek information directly relevant to the critical issues in the Appraisal Proceeding—namely (a) the non-privileged communications between Respondents and key stakeholders in the transaction that are outside of any privilege; (b) any prior relationships between the Respondents and those key third party stakeholders that would suggest potential conflicts of interest or improper influence; and (c) the fairness of the process undertaken by the Company and the Special Committee to evaluate the Merger. The Application does not seek any communications between Fenwick and its client, the Special Committee, concerning the provision of any legal advice, or any other form of protected material or work product. Rather, it seeks only information concerning Fenwick's interactions with third parties outside the scope of any attorney-client privilege, and other communications that were not for the

---

[2] A copy of the decision is attached as Exhibit 8 to the expert declaration of Judge Mangatal.

purpose of providing legal advice. It is well-established that attorneys and law firms are not immune from producing non-privileged discovery, including in the context of Section 1782.

*Finally*, to the extent any relevant information is located in Respondents' offices abroad, the physical location of the requested discovery should not restrict the scope of discovery permitted under this Application. Under the Second Circuit's decision in *In re del Valle Ruiz*, Section 1782 is extraterritorial in reach, and there is no bar on discovery located outside of U.S. Nor should the location of evidence influence the Court's discretion here. Where, as here, none of the Petitioners are party to the Appraisal Proceeding, courts commonly exercise their discretion to order discovery of evidence located abroad.[3]

## FACTUAL BACKGROUND

### A.    **Parties to the Foreign Proceeding**

Petitioners are funds that invested in 58.com and owned 58.com shares immediately before the effective date of the Merger that is the subject of Appraisal Proceeding. *See* Declaration of Marc Kish in Support of Petitioners' Application ("Kish Decl.") ¶ 13. Petitioners are respondents in the Appraisal Proceeding. *Id.* ¶ 13. Before the Merger, 58.com—China's largest online classifieds business—was a publicly traded corporation incorporated in the Cayman Islands. *Id.* ¶ 14. The Company's American Depository Shares ("**ADS**") were traded on the New York Stock Exchange. *Id.* ¶ 15. Jinbo Yao, the Company's CEO and founder, historically maintained significant control over the voting shares of 58.com. *Id.* ¶ 16.

### B.    **The Merger**

On June 15, 2020—three months after the world was plunged into the COVID-19 global pandemic, which had a temporary negative impact on the demand for the Company's online

---

[3] *See, e.g.*, *In re del Valle Ruiz,* 939 F.3d 520, 533–34 (2d Cir. 2019); *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020).

classifieds services and thus its share price—the Company announced that it had entered into a merger agreement through which 58.com would be acquired by Mr. Yao along with a consortium of private equity funds (the **"Buyer Group"**). *Id.* ¶ 19. In addition to Mr. Yao, the Buyer Group also included funds wholly owned and controlled by Warburg Pincus LLC and General Atlantic LLC—two New York-based private equity firms—along with Ocean Link Partners L.P., a China-based private equity firm. As noted, through Mr. Yao, the Buyer Group collectively controlled over 44% of the Company's voting shares as of August 7, 2020. *Id.* ¶ 20.

The announcement stated that on the effective date of the Merger, 58.com's publicly traded ADS—equity shares of a foreign company held by a U.S. depositary bank available for purchase by U.S. investors—would be canceled in exchange for the right to receive $56 per ADS. *Id.* ¶ 21. Under the terms of the Merger, 58.com was to become a wholly-owned subsidiary of a company called Quantum Bloom Group Ltd, which would be beneficially owned by the Buyer Group, including Mr. Yao, Warburg Pincus, General Atlantic, Ocean Link, and others.

Notably, other principal shareholders of the Company, including Tencent Holdings Ltd. (the **"Rollover Shareholders"**), controlled over 28.26% of the voting shares of 58.com. *Id.* ¶ 23. It was explicitly agreed under the terms of the Merger that shares held by the Rollover Shareholders would <u>not</u> be cancelled in exchange for the Merger price. Rather, shares held by the Rollover Shareholders would be converted into shares of the new private entity (and their pro-rata equity interest increased from 22.44% to 33.25%, giving Rollover Shareholders a significant financial benefit). The Merger was underwritten by Shanghai Pudong Development Bank Co., Ltd. (**"Shanghai Pudong Development Bank"**). *Id.* ¶ 22.

The lead-up to the Merger announcement was characterized by a flawed process designed to engineer the management buyout desired by Mr. Yao and his private equity partners. On March

24, 2020, the Company engaged Kaihui Limited (**"Kaihui Limited"**) as its consultant to explore strategic transactions. On April 2, 2020, Kaihui Limited contacted Ocean Link; incredibly, that very evening, Ocean Link submitted a proposal to acquire all the outstanding shares of the Company at $55 per share. The Company then decided to create a Special Committee of independent board members, which would be tasked with considering the Merger. However, there were <u>no</u> independent board members at the time. The Company consequently appointed two new board members: Li (Lily) Dong and Robert Frank Dodds, Jr. who, together, comprised the entire Special Committee.[4]

The Special Committee approved the engagement of Houlihan Lokey (China) Limited. (**"Houlihan Limited"**) as its financial advisor. At the request of the Special Committee, the Company began preparing updated financial projections "for use by [Houlihan Limited] in connection with its financial analysis." August Proxy Statement, Ex. B to Kish Decl. ("Proxy") at 29. These projections were created under the watch of the Company management who had an obvious incentive to underestimate the Company's financial prospects. Indeed, Houlihan Limited's valuation presentation indeed shows the Company management's profit projection was uniformly lower than projections of all nine Wall Street analysts, who followed the Company closely.[5] On May 21, 2020, the Special Committee, while purportedly comprised of independent directors, nonetheless declined to either conduct a "market check"—that is, contacting potential bidders for control of 58.com—or to insist on negotiations with the Buyer Group for the right to conduct a "go-shop," a procedure by which 58.com would be permitted to solicit competing bids.

---

[4] Ms. Dong and Mr. Dodds were appointed after the resignation of Frank Lin, an independent director who had served on the Company's board for over ten years. Despite deeming Ms. Dong and Mr. Dodds to be independent directors, the Company never disclosed Ms. Dong's and Mr. Dodd's preexisting relationships to the Company management or their relationships to the members of the Buyer Group.

[5] Proxy, Ex. (c)-(2), Houlihan Limited Presentation (June 12, 2020), at 23.

The Buyer Group's bid was never tested in the market, and shareholders lost all benefit of a competitive process to determine the actual market value of their shares.

Other features of the Merger process give rise to significant concern. The Special Committee treated Kaihui Limited as its advisor and agent throughout its negotiations with the Buyer Group, even though Kaihui Limited was hired by the same members of the Company's management that would later propose the transaction as part of the Buyer Group. The Special Committee was also guided by its counsel, Fenwick, which had preexisting relationships with several key stakeholders in the Merger, including the Company and Kaihui Limited. Ultimately, the Special Committee and the Buyer Group agreed to a purchase price of $56 per share, but only after removing a critical protection that would have required approval by a majority of the minority shareholders (the **"MoM Condition"**) to protect minority shareholder rights, making the approval of the transaction almost certain regardless of support from the minority shareholders. The negotiation process took only 74 days, and the price negotiation only lasted 10 days, a staggeringly rushed timeline designed to undervalue the Company and squeeze out minority shareholders.

The Merger announcement led to immediate concern expressed by minority shareholders and independent industry commentators. In June 2020, minority shareholder Aberdeen Standard Investments Ltd. wrote a letter to the SEC urging the agency to bar interested parties from voting on the proposal.[6] On August 26, 2020, Institutional Shareholder Services ("ISS"), a well-respected proxy-advisory firm, published a report opposing the transaction, stating "[t]he process that led to the buyer group's offer was flawed and the result of that process is questionable." ISS also performed its own financial analysis that showed "[t]he value offered to shareholders is out of sync with the company's historical valuation relative to peers."[7]

---

[6] *See* Loft Decl. Ex. 6.
[7] *See* Loft Decl. Ex. 7.

On September 7, 2020, the Company held an extraordinary general meeting of shareholders (the "**EGM**"), at which time 58.com shareholders voted on whether to approve the Merger. Kish Decl. ¶ 28. Only 15% of all shareholders that were unaffiliated with either the Buyer Group or the Rollover Shareholders voted in favor of the transaction. Despite such widespread opposition from the unaffiliated shareholders,[8] the transaction was forced through, given the lack of MoM: 61% of the Class A and Class B shareholders attended the EGM (which represented approximately 65% of the total outstanding votes), and the Merger was approved by over 75% of the total votes that were cast, with the Rollover Shareholders themselves surprisingly opting to abstain. *Id*. Accordingly, Petitioners' shares and the shares of all remaining stockholders—other than Members of the Buyer Group—were canceled in exchange for the Merger consideration effective September 17, 2020, at a price Petitioners allege is substantially below their fair value. *Id*. ¶ 29.

C.     **The Merger's Unfair Price and Process**

As alleged in the Appraisal Proceeding, the Merger price significantly undervalued 58.com shares and was coercive and unfair to 58.com's minority shareholders. *First*, the Merger was timed to capitalize on a temporary depression in 58.com's trading prices associated with the pandemic. The proposed buyout price of $56 per share is dramatically below 58.com's pre-pandemic trading prices. Indeed, on January 16, 2020—immediately before the recent market-wide decline associated with coronavirus—58.com's NYSE-listed ADS closed at over $69 per share. *Id*. ¶ 34.

*Second*, as noted, the Merger did not contain a MoM Condition to protect 58.com's minority shareholders. Incredibly, the Special Committee agreed to waive this critical protection in exchange for a mere $1 increase of the proposed purchase price and the removal of an option to not progress with the Merger based on the number of shareholders exercising dissent rights.

---

[8] Notices of objection were delivered by shareholders of at least 70,524,198 shares.

Without MoM protection, the deal was a foregone conclusion because the Buyer Group collectively controlled the majority of the Company's voting shares.

*Third*, the process to approve the Merger was flawed. The Special Committee made no effort to conduct a proper competitive sale process and thus allowed the Buyer Group and Rollover Shareholders to cash out the Dissenting Shareholders at a depressed price. Faced with a Buyer Group that controlled such a large number of the Company's shares and that was led by the CEO, the Special Committee did not solicit a single additional bid, did not conduct a "market check," and did not insist on a "go-shop" provision—all standard features of a legitimate sale process intended to protect minority shareholders.[9] The Special Committee was also responsible for negotiating away the critical MoM protection mentioned above. *Id.* ¶ 27.

*Fourth*, the Merger was structured such that all shares *other than* those held by the Buyer Group and the Rollover Shareholders were to be cashed out through the Merger. Neither would be losing their stake in the Company and its valuable business in return for receiving only the $56 Merger consideration. In fact, while the Rollover Shareholders did not buy additional shares in the Company, by simply rolling over their shares their pro rata equity increased from 22.44% to 32.25%. Thus, the Rollover Shareholders had every reason to allow the Merger to proceed, at the expense of minority shareholders. And the Buyer Group, with the help of the Rollover Shareholders, could push the Merger through with over 75% of the voting shares cast. *Id.* ¶ 28.

*Fifth*, the fact that Mr. Yao—the Company's longtime controlling shareholder, founder, Chairman, and CEO—helped orchestrate the Merger at a depressed price indicates the Merger was essentially a management buyout of 58.com and further shows the Company was taken private to enrich those in control of the Company at the expense of minority shareholders. Despite Mr. Yao's

---

[9] *See* Proxy at 30.

fiduciary obligation to steward the Company for the benefit of all shareholders, he teamed up with private equity funds to buy the Company for his own benefit while its trading price was depressed during the pandemic.

*Finally*, under the terms of the Merger Agreement, in the event the Company received an unsolicited alternative bid of greater value (a "**Superior Proposal**"), the Buyer Group had unlimited match rights. To be able to accept a Superior Proposal, the Company and the board had to, among other things, provide the Buyer Group with an opportunity to match or exceed the competing bid and pay a termination fee of $126,400,000.[10] Under those circumstances, any bidder understood that the Buyer Group—which included senior 58.com management with exclusive inside knowledge of the Company—would likely match each of its bids up to the fair value of the Company, causing such a bidder to risk, if it won, overpaying for the 58.com shares. These onerous requirements essentially guaranteed the Merger would be unchallenged by any competing bid, and severely deterred any potential bidders from making a bid in the first place.

### D.   Petitioners' Cayman Islands Appraisal Proceeding

Under Section 238 of the Companies Act, the Cayman Court in the Appraisal Proceeding has a statutory obligation to determine the fair value of the dissenting shareholders' shares. As described in the accompanying declaration of Judge Mangatal (the "**Mangatal Declaration**"), the parties to the Appraisal Proceeding—including the Petitioners and 58.com—will submit evidence, expert testimony, and legal briefs to the Cayman Court, which will weigh the evidence and determine the fair value of Petitioners' shares. *See* Mangatal Decl. ¶ 18. In assessing fair value in a Cayman Islands Appraisal Proceeding, the Cayman Court will examine the fairness (or lack thereof) of the process that led 58.com's board to approve the Merger. In doing so, the Cayman

---

[10] *See* Proxy at 13.

Court will consider the fairness of the Merger to 58.com's minority stockholders and will likely focus on, among other things, the process by which the 58.com board and/or Special Committee negotiated and approved the Merger price, and the valuations relied upon by the 58.com Special Committee and the Buyer Group.

      E.      **Discovery in the Cayman Islands Appraisal Proceeding**

As set forth in detail in the Mangatal Declaration, there is no automatic right to discovery in Section 238 proceedings similar to pre-trial discovery in the United States. Instead, only upon Court order is a party to the proceeding required to provide discovery of "documents which are in their possession, custody or power relating to any matter in question between them in the action." Mangatal Decl. ¶ 32 (citing Grand Court Rules ("GCR") Order 24 rule 3). Discovery of non-parties, particularly those like Respondents that are outside the Court's jurisdiction, is very limited, subject to cumbersome procedures, and rarely used. *Id.* ¶ 43.

Nevertheless, Cayman Courts remain receptive to evidence obtained through other judicial measures such as 28 U.S.C. § 1782. Indeed, as explained by Judge Mangatal, "Cayman courts have had the opportunity to consider specifically the use of 28 U.S.C. §1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant in a Cayman Islands proceeding to exercise any rights it may have under 28 U.S.C. § 1782 to obtain relevant evidence for use in proceedings in the Cayman Islands." *Id.* ¶ 55. All relevant evidence obtained through this Application will thus be admissible in the Cayman Court. *Id.* ¶ 53. Furthermore, Cayman Islands courts expect the parties to obtain the evidence they believe is necessary to prosecute their case. *Id.* ¶ 66. There is no requirement to obtain permission from a Cayman Islands court before seeking relevant evidence abroad in the U.S. under 28 U.S.C. § 1782. *Id.* And indeed, the court order that governs discovery in the Appraisal Proceeding (the "Directions Order") contains a provision that expressly contemplates the use of Section 1782. *See* Loft Decl Ex. 8 ¶ 50.

F.     **Respondents and the Discovery Sought**

Fenwick is a law firm that acted as counsel for the Special Committee of 58.com.[11] Morrow

Sodali is a shareholder engagement and governance consulting firm, which acted as the

Company's proxy solicitor during the Merger.[12] Petitioners seek limited discovery from the

Respondents, targeted at issues central to the Appraisal Proceeding. Fenwick played a critical role

in advising the Special Committee while the Special Committee negotiated the terms of the Merger

and the ultimate Merger price. Among other things, Fenwick acted as a communications conduit

for many of the entities involved in the Merger negotiations. The Proxy Statement documents that

Fenwick was in communication with members of the Buyer Group such as Warburg Pincus,

General Atlantic, and Ocean Link.[13] Fenwick's frequent and substantive communications with the

major parties to the Merger suggests that Fenwick possesses key information about the negotiation

process that would be of use in the Appraisal Proceedings.

According to the Proxy Statement, Fenwick consulted on a variety of non-legal, business-

related matters. Fenwick advised the Special Committee on the "potential benefits and risks" of

---

[11] Fenwick, "Fenwick Represents Special Committee of 58.com Board of Directors in Definitive Agreement for Going-Private Transaction" (June 15, 2020), https://www.fenwick.com/insights/experience/fenwick-represents-special-committee-of-58-com-board-of-directors-in-definitive-agreement-for-going-private-transaction. Fenwick maintains a New York office at 902 Broadway, Suite 14, New York, NY 10010. Fenwick partner Ken S. Myers is a member of the team that represented the Special Committee. *See id.* ("The Fenwick transaction team included corporate partner[] . . . Ken Myers"); Proxy at A-72 (listing Ken S. Myers, Esq., as one of three Fenwick partners to direct transaction-related communications to the care of). Ken S. Myers is based in Respondent's New York office. *See* Fenwick, "Ken S. Myers," https://www.fenwick.com/people/ken-s-myers.

[12] Proxy at 25 ("To assist in the solicitation of proxies, the Company has engaged Morrow Sodali as its proxy solicitor."). Morrow Sodali is headquartered in New York and has its principal place at 509 Madison Avenue, Room 1206, New York, NY 10022.

[13] Proxy at 28 (discussing Fenwick's interactions with "the PE Firms," i.e., General Atlantic, Warburg Pincus, Ocean Link, and their affiliates regarding confidentiality agreements); *id.* at 29 ("Fenwick provided an update regarding the execution of confidentiality agreements by Warburg Pincus Asia LLC, an affiliate of Warburg Pincus, GA Fund and Ocean Link Partners Limited, an affiliate of Ocean Link, on May 2, 2020 and expected execution of joinders to the confidentiality agreement by and between the Special Committee and Ocean Link Partners Limited, an affiliate of Ocean Link, by certain banks in connection with potential debt financing"); *id.* at 32 (referencing "communications between representative of Fenwick and the legal counsels to the Buyer Group," including Kirkland & Ellis, international co-counsel to the Buyer Group; *id.* at 33 (referencing communications between Fenwick and other Buyer Group co-counsel Wilson Sonsini and Paul Weiss).

whether to conduct a market check or go-shop, a critical business consideration in the Merger negotiations that could directly affect the Merger price.[14] Similarly, Morrow Sodali had a critical role in the Merger. Morrow Sodali was engaged by the Company to act as a proxy solicitor, managing shareholders who were sometimes vocal about their concerns about and disapproval of a potential Merger.[15] Morrow Sodali worked closely with the Company to gather proxy votes for the Merger and was likely privy to internal Company conversations about the Merger terms, the Merger price, and the attendant negotiations.

## ARGUMENT

Section 1782 of Title 28 of the United States Code permits United States district courts to grant discovery for use in a pending foreign proceeding or a foreign proceeding. *Intel,* 542 U.S. at 243. An application under Section 1782 must satisfy three statutory requirements: (1) the discovery is sought from someone who resides or is found within the District; (2) the discovery is for use before a foreign tribunal; and (3) the applicant is an "interested person." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017). If these statutory requirements are met, the court then considers four discretionary "*Intel*" factors. *Intel*, 542 U.S. at 264–65.[16] In considering these factors, the court is required to keep in mind "the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example

---

[14] For example, at a meeting that took place on May 21, 2020, "[t]he Special Committee members and representatives of Fenwick then discussed the potential benefits and risks of conducting a 'market check' prior to entering into a merger agreement in which it would reach out to third parties to solicit potential interest in an acquisition of the Company, or retaining a 'go-shop' right to engage in such a process after entering into a merger agreement." Proxy at 30. After discussing the matter with Fenwick, "the Special Committee concluded that reaching out to third parties to assess their interest in an alternative transaction would be very unlikely to produce a competing offer on terms better than the Proposal and would not be in the best interests of the Company and its shareholders." Proxy at 30.

[15] Proxy at vii ("If you have any questions or need assistance voting your Shares or ADSs, please contact Morrow Sodali, the proxy solicitor, at +1 (800) 662-5200 (U.S. Toll-Free) or +1 (203) 658-9400 (Non-U.S. Direct), or by email at 58@investor.morrowsodali.com.").

[16] None of these factors should be given more weight than the others, and no one factor is dispositive. *See Marubeni Am. Corp. v. LBA Y.K.*, No. 08-3282-CV, 335 F. App'x 95, 97 (2d Cir. June 17, 2009).

to provide similar assistance to our courts." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (quotations and citations omitted).

## I.     The Application Satisfies the Three Statutory Requirements of 28 U.S.C. 1782.

Petitioners satisfy the three threshold statutory requirements of Section 1782.

### A.  Respondent "Resides" or Is "Found in" this District.

Under *Valle Ruiz*, Section 1782's first statutory element—that an entity "reside or be found" in a district—is coextensive with specific personal jurisdiction. *Valle Ruiz*, 939 F.3d at 527–528 (holding that "resides or is found" in Section 1782 "extends to the limits of personal jurisdiction consistent with due process," not merely general personal jurisdiction). Therefore, the "resides" or "found in" requirement is satisfied when the entity is headquartered in the state. *See In re Petrobras Securities Litig.*, 393 F. Supp. 3d 376, 382 (S.D.N.Y. 2019). Morrow Sodali is headquartered in the District, with its principal corporate address in New York, New York, and therefore satisfies the "resides" or "found in" requirement.

As to Fenwick, the firm is subject to specific jurisdiction in the District as Fenwick satisfies the standard that its "suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotation marks and citations omitted). The relationship between the defendant and the forum "must arise out of contacts that the 'defendant himself' creates with the forum." *Id*. (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Fenwick maintains a New York office that, as of 2018, served as the home office for 45 attorneys and cultivated "a solid base of clients in the New York area."[17] Ken S. Myers is a Fenwick partner based out of the New York office who served as a member of the team serving

---

[17] Fenwick, "Fenwick Opens Office in New York's Tech Hub" (Oct. 8, 2018), hereinafter "Fenwick New York Office Press Release," https://www.fenwick.com/insights/our-news/fenwick-opens-office-in-new-yorks-tech-hub.

the Special Committee during the negotiation of the Merger.[18] The Second Circuit has found that a law firm establishing a physical and business presence in the New York legal market constitutes "purposeful availment" of the forum. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002).[19] Fenwick's New York office establishes a substantial connection with the District, and Fenwick's solicitation and handling of business in the District subjects Fenwick to specific jurisdiction as to its client engagements. *See* Fenwick New York Office Press Release ("Our move to the Flatiron district and our unique office space underscores our commitment to innovation in the practice of law *and to the support and growth of our East Coast and global client base*") (emphasis added).[20] Under these standards, Fenwick is found in this District.

B.     **The Discovery Sought Is "For Use" In a Foreign Proceeding.**

To establish that the information sought is "for use" in a foreign proceeding, Petitioners must merely show that they have "the procedural right to submit the requested documents to" the foreign tribunal. *In re Accent Delight Int'l Ltd.*, 869 F.3d at 132. A Section 1782 petitioner is not required to demonstrate that the information sought would be discoverable or admissible in the foreign proceedings.[21] Instead, the district court considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re*

---

[18] Fenwick, "Fenwick Represents Special Committee of 58.com Board of Directors in Definitive Agreement for Going-Private Transaction" (June 15, 2020), https://www.fenwick.com/insights/experience/fenwick-represents-special-committee-of-58-com-board-of-directors-in-definitive-agreement-for-going-private-transaction.

[19] *See id.* ("Law firms obtain new business largely through reputation and word of mouth, and thus the activities of a firm which maintains its presence and reputation in a particular legal market certainly can be said to be a proximate cause of the engagements it obtains in that market.").

[20] *See Bank Brussels*, 305 F.3d at 128–29 ("[As to] a law firm which seeks to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom . . . we see nothing fundamentally unfair about requiring the firm to defend itself in the New York courts when a dispute arises from its representation").

[21] *See Brandi-Dohrn v. IKB Deutsche Industriebank AG,* 673 F.3d 76, 82 (2d Cir. 2012) ("as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application").

*Accent Delight Int'l Ltd.*, 869 F.3d at 131 (emphasis added).[22] Cayman Courts will accept and consider any relevant evidence submitted by the parties, so long as it is lawfully obtained in the jurisdiction in which it originates and not otherwise subject to an exclusionary rule of evidence. *See* Mangatal Decl. ¶ 53. Cayman Courts have emphasized the need to consider all facts and matters which may have a bearing on the determination of fair value. *See id.* ¶ 37 (citing *Qihoo 360 Technology Co., Ltd.,* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information.")). And the Directions Order that governs discovery in the Appraisal Proceeding expressly contemplates the use of Section 1782 proceedings to obtain discovery. *See* Loft Decl. Ex. 8 ¶ 50. The Cayman Court will thus undoubtedly accept and consider the Requested Discovery given its relevance in determining the fair value of Petitioners' 58.com shares. Magnatal Decl. ¶ 66.

Finally, the Requested Discovery is intended for use in the Appraisal Proceeding, which was filed on November 10, 2020. Kish Decl. ¶ 32. The Requested Discovery is therefore plainly "for use" in the Appraisal Proceeding, and Petitioners have thus satisfied the second statutory requirement.[23]

C.    **Petitioners Are "Interested Persons."**

"Litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F.Supp. 2d 434, 256 (S.D.N.Y. 2011) ("No doubt litigants are included among . . . the interested persons who may invoke § 1782.") (quoting *Intel*,

---

[22] *See also Mees*, 793 F.3d at 298 ("for use" element satisfied if materials sought can "be employed with some advantage or serve some use in the proceeding").

[23] *See In re Appl. of Temporary Services Ins. Ltd.*, 2009 WL 2843258, at *2 (W.D.N.Y Aug. 28, 2009) (finding discovery sought for use in Cayman proceeding satisfied this prong).

542 U.S. at 256). Because Petitioners are claimants in the Appraisal Proceeding, Kish Decl. ¶ 34, they are "interested persons." All of the statutory elements are thus satisfied here.

## II.   The *Intel* Discretionary Factors Weigh in Favor of Granting Discovery.

Once the statutory threshold requirements of Section 1782 are met, a district court considers, in its discretion, whether to order the requested discovery. To do this, the district court looks to the four "*Intel* factors." *See Intel*, 542 U.S. at 264; *see also Mees*, 793 F.3d at 298. Each of the *Intel* factors is discussed below and weighs in favor of granting the Application.

### A.   Respondents Are Non-Participants in the Appraisal Proceeding.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. The reason for this inquiry is because "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Respondents are not a party in the Appraisal Proceeding, and therefore will not be subject to party discovery in the Appraisal Proceeding. Mangatal Decl. ¶ 42. Further, because Respondents reside in the United States, the Cayman Court will not have jurisdiction to compel discovery from them. *Id*. Petitioners, therefore, will not be able to take discovery of Respondents through the Appraisal Proceeding, even though evidence from Respondents is crucial to the fair resolution of the dispute. Accordingly, this first *Intel* factor weighs in favor of granting the Application.[24]

---

[24] *See Intel*, 542 U.S. at 256 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."); *In re Top Matrix Holdings, Ltd.*, 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) ("[T]hat information possessed by Credit Suisse USA is also likely possessed by Credit Suisse in Switzerland is not relevant" when "neither is within the jurisdiction of the Swiss courts.").

B.      **The Cayman Islands Court Will Be Receptive to the Evidence Sought.**

The second *Intel* factor requires courts to consider whether the "nature, attitude, and procedures" of the foreign tribunal indicate that it is receptive to Section 1782 assistance. Notably, there is a strong presumption that foreign tribunals will be receptive to evidence obtained under Section 1782, and thus the burden is placed on the party opposing discovery to show that a foreign tribunal would reject the evidence obtained through 1782.[25] Absent authoritative proof that the foreign tribunal would reject evidence obtained through Section 1782, courts are inclined to grant the application for discovery.[26]

Cayman courts will consider any evidence that has a bearing on determining the fair value of a company's shares. *See* Mangatal Decl. ¶ 30. Moreover, as set forth in the Mangatal Declaration, Cayman courts have specifically held that it is permissible to use a Section 1782 application to obtain discovery for use in Cayman Islands proceedings. *See id.* ¶ 49. Indeed, the Cayman Court of Appeal has expressly held that the right to obtain full discovery, including pre-trial deposition testimony, "is a right conferred by U.S. law—it is not a right conferred by, or *to be withheld under Cayman law.*" *id.* ¶ 56 & Ex. 6. Further, multiple United States courts have recognized that Cayman Islands courts are receptive to evidence obtained through Section 1782. Indeed, several U.S. courts have recently granted Section 1782 discovery for use in the Appraisal Proceeding, in connection with six separate applications.[27] Courts have recognized this principle

---

[25] *See Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*, No. 12 MC 221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012).

[26] *See In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, No. M 10-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009).

[27] *See In re FourWorld Event Opportunities*, No. 2:21-mc-019 CAS JPR (C.D. Cal., filed July 23, 2021) (against Houlihan Lokey); *In re FourWorld Event Opportunities*, No. 1:21-mc-00543-PKC (S.D.N.Y., filed July 23, 2021) (against Warburg Pincus and General Atlantic); *In re FourWorld Event Opportunities*, No. 1:21-mc-00283-RGA (D. Del., filed July 23, 2021) (against Warburg Pincus Asia LLC); *In re FourWorld Event Opportunities*, No. 2:22-mc-00022 (C.D. Cal., filed Feb. 2, 2022) (against Christopher Hsu, the head of Kaihui Limited); *In re FourWorld Event Opportunities*, No. 1:22-mc-00018-TNM (D.D.C., filed Feb. 3, 2022) (against Robert Dodds); *In re FourWorld Event Opportunities*, No.. 1:22-mc-91099-IT (D. Mass., filed Feb. 3, 2022) (against Bain & Company, which conducted a

18

across other cases.[28] The receptivity of the Cayman Court to evidence obtained through this Application will be no different.

C.    **Petitioners Are Not Circumventing Foreign Proof-Gathering Restrictions.**

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Importantly, the third *Intel* factor is satisfied unless the foreign court actively prohibits the petitioner from gathering the information sought.[29] In addition, there is no "quasi-exhaustion requirement," *i.e.*, a requirement that petitioner first seek the discovery in a foreign court.[30] The discovery sought does not attempt to circumvent any proof-gathering restrictions in the Cayman Islands. To the contrary, as Judge Mangatal explains, "Cayman courts expect the parties to obtain the evidence they believe is necessary to prosecute their case" and "[t]hus there is no requirement to obtain permission from a Cayman court before seeking relevant evidence abroad." Mangatal Decl. ¶ 66. The Cayman Islands Court of Appeal has expressly held

---

commercial due diligence for the Buyer Group).

[28] *See also In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018) ("Liquidators present unrebutted evidence that, far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law."); *Gushlak v. Gushlak*, 486 F. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 applications in connection with Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782 applications seeking documents for use in Cayman proceedings); *In re Penner*, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman Court "is open to receiving § 1782 discovery"). Indeed, two district courts recently granted 1782 petitioners' applications for both document discovery and a deposition for use in an appraisal proceeding in the Cayman Islands. *See In re Application of Athos Asia Event Driver Master Fund*, No. 4:21-MC-00153-AGF, 2021 WL 1611673, at *1 (E.D. Mo. Apr. 26, 2021) ("There is no indication in the record here that a discovery order would be unwelcome by the Cayman Islands court."); *In re Application of Athos Asia Event Driven Master Fund*, No. 1:21-MC-00208-GBF, ECF 8 (S.D.N.Y. Mar. 3, 2021) (granting 1782 petition for discovery for use in Cayman appraisal proceeding).

[29] *See Brandi-Dohrn*, 673 F.3d at 82 ("as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application"); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.").

[30] *See In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997); *In re Appl. of Imanagement Servs. Ltd.*, No. Misc. 05-89 (FB), 2005 WL 1959702, at *5 (E.D.N.Y. Aug. 16, 2005) (same).

that "*prima facie* a party who can invoke the jurisdiction of the US District Court under § 1782 may choose to do so." *See* Mangatal Decl. ¶ 58.

### D.   The Subpoenas Are Not Unduly Burdensome.

The final *Intel* factor looks to whether the discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.[31]

### 1.   The Subpoenas Only Seek Non-Privileged Discovery.

"Law firms are not immune from discovery." *Matter of Degens*, No. 20-mc-237 (JGK) (RWL), 2020 WL 4252725, at *6 (S.D.N.Y. July 24, 2020). Law firms have been ordered numerous times within this District to produce documents pursuant to a Section 1782 subpoena.[32] This mirrors the willingness of courts generally to order Section 1782 discovery involving law firms and lawyers, especially when respondents cannot offer more than blanket assertions of attorney-client privilege.[33] Petitioners seek only non-privileged information from Respondents. In particular, with respect to Fenwick, the Subpoena is narrowly limited to documents that fall outside the protection of attorney-client privilege. These fall into two groups: communications with key third party stakeholders and communications with the Special Committee or any of its agents or advisors that were not for the purpose of providing legal advice.

---

[31] *See In re Bayer AG*, 146 F.3d 188 at 195 (3d Cir. 1998) ("The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."); *Valle Ruiz*, 939 F.3d at 532–33 ("[T]he text of § 1782 authorizes discovery pursuant to the Federal Rules of Civil Procedure").

[32] *See, e.g.*, *id.* (any "potential concerns about attorney-client privilege and attorney work product" stemming from requests for discovery from a law firm "can easily be addressed through privilege logs"); *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165 (2003) (ordering discovery against law firm); *Pearson v. Trinklein*, No. 21-MC-770 (ALC) (JLC), 2022 WL 1315611 (S.D.N.Y. May 3, 2022) (same).

[33] *See, e.g.*, *Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assocs. CHTD*, 538 F. Supp. 3d 21, 31 (D.D.C. 2021) ("although some of the documents FDH seeks from DeWitty may be privileged, . . . without more than DeWitty's blanket assertion of privilege, the Court cannot find that [the fourth] *Intel* factor weighs against granting FDH's application"); *In re Veiga*, 746 F. Supp. 2d 27, 40 (D.D.C. 2010) (granting discovery because "the Court cannot say, with reasonable certainty, that the communications withheld on the basis of the attorney-client privilege were made outside the presence of strangers, in counsel's capacity as an attorney, or for the purposes of securing legal advice").

*First*, with respect to communications with third parties, communications between Fenwick and third parties such as the Buyer Group, the Rollover Shareholders, Shanghai Pudong Development Bank, and Kaihui Limited or their respective agents and representatives are presumptively discoverable. It is well-established that third parties who do not act as "translators" or "interpreters" of legal communications are not protected by the attorney-client privilege. *United States v. Ackert*, 169 F.3d 136, 140 (2d Cir. 1999) (citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)). *In re Iraq Telecom Ltd.*, 2021 WL 5177603 (E.D. Pa. Nov. 5, 2021) is instructive in this regard. In *Iraq Telecom*, a Section 1782 case, Dechert LLP withheld communications between its attorneys and a supposed "agent" of Dechert's client on the basis of attorney-client privilege. The supposed "agent" was listed by name in Dechert's engagement letter, which identified the supposed "agent" as "the point person for [the client] in communication with Dechert." Brief in Opposition to Motion to Compel, *In re Iraq Telecom*, No. 2:19-mc-175 (RBS), ECF 24, at 1 (Dec. 15, 2020). Nevertheless, the court still held the so-called "agent" was not "necessary to [the client's] engagement of Dechert's legal services" and thus ineligible for attorney-client privilege— even though the individual was even named in the engagement letter as the client's "point person" for "communication with Dechert." The court in *Iraq Telecom* believed that true agents must play a substantive role such that they become "necessary for the client to obtain informed legal advice." 2021 WL 5177603, at *5.[34] Here, the bulk of Petitioners' discovery requests seek communications between Fenwick and ancillary entities that could not possibly be "necessary" for the Special

---

[34] The Third Circuit and the Second Circuit adopt similar standards with respect to non-attorney third parties and the attorney-client privilege. *Compare Iraq Telecom*, 2021 WL 5177603, at *5 ("for privilege to attach to communications with a third-party, the party asserting privilege must demonstrate that the third-party disclosure was necessary for the client to obtain informed legal advice and that the agent was a necessary intermediary"), *with United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("*Kovel* held that the privilege can protect communications between a client and his accountant, or the accountant and the client's attorney, when the accountant's role is to clarify communications between attorney and client . . . . That decision recognized that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client.").

Committee to "obtain informed legal advice." There is no plausible argument that entities such as the Buyer Group, the Rollover Shareholders, or Shanghai Pudong Development Bank were ever agents of the Special Committee. And even if Kaihui Limited or Christopher Hsu, who were engaged as consultants for the Company, ever had an agency relationship with the Special Committee, they clearly were not "translators" or "interpreters" of legal advice. The attorney-client privilege in no way protects Fenwick's communications with these third party stakeholders.

*Second*, with respect to communications with Special Committee or its agents and advisors, such communications are not automatically privileged. In complex transactions such as the Merger, law firms often supply non-privileged business advice in addition to privileged legal advice. Courts in this District have ordered law firms to produce communications concerning the former, including in the Section 1782 context.[35] In *Degens*, for instance, the court recognized that in cases involving complex financial matters, law firms often render both legal and business advice, and Section 1782 discovery can reach documents pertaining to the latter:

> Much of the work performed by the law firms for [their clients] appears not to have been legal advice. Rather, it was business related, involving, for example, . . . [where one law firm] appears to have provided advice with respect to asset preservation strategies. . . . . [W]hile advice about asset preservation may well have been legal in nature, implementation of preservation strategies likely would not. Accordingly, concern for the attorney-client privilege should not be an impediment to granting discovery from the two law firms.

2020 WL 4252725, at *6. While it is likely that at least some of Fenwick's advice to the Special Committee related solely to legal matters—and communications containing such advice would not be discoverable on privilege grounds—there is no basis to believe that *all* of Fenwick's

---

[35] *See, e.g.*, *Degens*, 2020 WL 4252725, at *6 (ordering discovery that was "business related"); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 165–67 (S.D.N.Y. 2010) (noting that "[a] lawyer's dual legal and non-legal responsibilities may bear on whether a particular communication was generated for the purpose of soliciting or rendering legal advice") (internal quotation marks omitted), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

communications related solely to legal advice. Indeed, the Proxy Statement openly refers to at least one instance where Fenwick weighed in on a crucial business decision: whether to undertake a market check or a go-shop,[36] which is clearly not a strictly "legal" matter. Such decisions necessarily implicate a variety of business considerations, including whether such strategies would be likely to result in a higher Merger price.[37] Documents pertaining to Fenwick's role in assisting the Special Committee in reaching such decisions likely contain non-legal business advice and are therefore discoverable.[38] Other documents sought by Petitioners, such as documents predating Fenwick's representation of the Special Committee but evidencing potential relationships to key participants in the Merger, are similarly non-privileged.[39]

2.    The Subpoenas Are Properly Limited in Scope.

Here, the Subpoenas are narrowly tailored both with respect to the time period and subject matter of the requests. *First*, the Subpoenas are limited to documents and information directly relevant to three relevant issues in the Appraisal Proceeding—(a) non-privileged communications between Respondents and third parties in connection with the Merger; (b) the valuation of the Company; and (c) any prior relationship between the Respondents and Kaihui Limited. *See*

---

[36] At a meeting that took place on May 21, 2020, "[t]he Special Committee members and representatives of Fenwick . . . discussed the potential benefits and risks of conducting a 'market check' prior to entering into a merger agreement in which it would reach out to third parties to solicit potential interest in an acquisition of the Company, or retaining a 'go-shop' right to engage in such a process after entering into a merger agreement." Proxy at 30.

[37] According to the Proxy Statement, after consulting Fenwick at the end of the May 21, 2020 meeting, "the Special Committee concluded that reaching out to third parties to assess their interest in an alternative transaction would be very unlikely to produce a competing offer on terms better than the Proposal and would not be in the best interests of the Company and its shareholders." Proxy at 30.

[38] Fenwick participated in other non-legal discussions as well. According to the Proxy Statement, on May 26, 2020, Fenwick participated in a telephonic Special Committee meeting with Houlihan Lokey, Kaihui Limited, and the Company's CFO which covered, among other things: "the Company's business model, revenues and costs, the potential impact of the COVID-19 pandemic on the Company's business, the effect of competition on the Company, trends in the Company's gross margins, and the Company's need to increase its investment in certain services." Proxy at 30.

[39] *See Diversified Grp. Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 508 (S.D.N.Y. 2003) ("attorney-client privilege did not apply to pre-engagement communications between [future client] and attorney" because communications did not seek legal advice).

Mangatal Decl. ¶ 17. In a recent appraisal decision, the Cayman Court expressly referred to the 2,900 documents produced in a Section 1782 proceeding by Houlihan Lokey, an entity that, like Respondents, was not a direct participant to the relevant transaction but an advisor to the Special Committee that approved it or to the Company at large. Mangatal Decl. ¶ 58. The court found that discovery was "obviously relevant to advancing a reasoned critique of Houlihan Lokey's DCF analysis." *Id.* Thus, given the similar advisory role played by Respondents here, the discovery sought here is likewise relevant. *Second*, with two exceptions,[40] the discovery requests are also temporally limited to the months during which Respondents were engaged by the Special Committee related to the Merger.[41] *Third*, Petitioners will meet and confer with Respondents to address any scope or burden concerns. And if the Court has any remaining concerns about undue burden, granting the Application will not preclude Respondents "from contesting the subpoena[s] (including a motion to quash or modify)" the discovery sought. *Strike 3 Holdings, LLC v. Doe*, No. 20–cv–7923 (LJL), 2020 WL 5992346, at *2 (S.D.N.Y. Oct. 9, 2020).[42]

### 3.   A Rule 30(b)(6) Deposition Is Appropriate Here.

District courts have typically been "generous" in granting Rule 30(b)(6) depositions in Section 1782, even in cases with "tight schedule[s]" and other potential difficulties. *In re Ex Parte Application of Porsche Automobil Holding SE*, No. 15-MC-417 (LAK), 2016 WL 702327, at *13 (S.D.N.Y. Feb. 18, 2016) (permitting 30(b)(6) deposition despite "tight schedule" because it was

---

[40] The two exceptions are requests that relate specifically to relationships that pre-dated Respondents' retention and documents concerning the process by which Respondents were selected by the Special Committee, and both topics bear directly on the issue of potential conflicts and the lack of Special Committee independence.

[41] *See In re Gushlak*, No. 11–MC–218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) (holding that a Section 1782 request, like any other discovery request, is "reasonably calculated to lead to relevant matter if there is any possibility that the information sought may be relevant to the subject matter of the action") (emphasis in original); *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding reasonableness of subpoena that only sought documents which concern "the precise subject matter of the underlying [proceedings]").

[42] *See also In re Letter of Request from Supreme Ct. of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991). If the Court agrees, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa, S.A*, 51 F.3d at 1101.

"relatively evident from precedent in this circuit generous to Section 1782 applicants that there was a reasonable chance they would have to produce documents and prepare witnesses on a short timetable").[43] Given the role that Respondents played in this matter, 30(b)(6) depositions of corporate representatives are appropriate and will significantly aid the Cayman Court.

## III.   Expedited Compliance with the Subpoenas Is Warranted.

In the event the Court grants Petitioners' Application, Petitioners respectfully request that the Court direct Respondents to produce responsive documents within 30 days of service and submit to a deposition on a mutually agreeable date within a reasonable time after Respondents' confirmation of final production of documents. Expedition of this Application and Respondents' time to comply with the Subpoenas will permit sufficient time for (a) this Court's resolution of Petitioners' Section 1782 Application and any objections to the Subpoena; (b) Respondents' collection, review, and production of responsive documents; (c) Petitioners' counsel's review of documents produced by Respondent; and (d) Petitioners' timely submission of relevant documents to the court. This expedition is important given that, under the Directions Order that currently governs the Appraisal Proceeding, the deadline for Petitioners to submit factual evidence to the Cayman court is November 23, 2022. *Id.* ¶ 41. While Petitioners will, if necessary, apply to the Cayman court for an extension of the relevant deadlines to accommodate the inclusion of discovery obtained through this application, there is no guarantee an extension would be granted, particularly if the Company were to oppose such an extension.

## CONCLUSION

Petitioners respectfully request that the Court grant their Application.

---

[43] *See also In re Mother's Milk, Inc.*, No. 5:20–MC-00004–M, 2020 WL 2514315, at *5 (S.D.N.Y. May 15, 2020) (permitting 30(b)(6) deposition because it would "provide helpful evidence to the [foreign] court in moving the case forward."); *In re Accent Delight Int'l Ltd.*, Nos. 16-MC-126 (JMF), 18-MC-50 (JMF), 2018 WL 2849724 (S.D.N.Y. June 11, 2018) (same).

Dated: July 19, 2022

By:     */s/ Duane L. Loft*

BOIES SCHILLER FLEXNER LLP
Duane L. Loft
Andrew P. Steinmetz
Brianna S. Hills
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2380
dloft@bsfllp.com
asteinmetz@bsfllp.com
bhills@bsfllp.com

LABATON SUCHAROW LLP
Ira A. Schochet
140 Broadway
New York, NY 10005
Telephone: (212) 907-0864
ischochet@labaton.com

GRANT & EISENHOFER P.A.
Christine Mackintosh (*pro hac vice* application
forthcoming)
123 S. Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7081
cmackintosh@gelaw.com

*Attorneys for Petitioners*