UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re Application of

FOUR WORLD EVENT OPPORTUNITIES LP and GENESIS EMERGING MARKETS INVESTMENT COMPANY,

Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding.

Case No. 22-

---

# DECLARATION OF MARC KISH IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Marc Kish, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney licensed to practise law in the Cayman Islands, and I am admitted to practise before the courts of the Cayman Islands. I am a partner in the law firm Ogier.

2. I represent several dissenting shareholders, including the petitioners Four World Event Opportunities LP and Genesis Emerging Markets Investment Company ("**Petitioners**"), in proceedings pending before the Grand Court of the Cayman Islands (the "**Grand Court**") to determine the fair value of the shares of 58.com ("**58.com**" or the "**Company**"), (the "**Appraisal Proceedings**").

3. I submit this declaration in support of the Petitioners' application seeking an order pursuant to 28 U.S.C. § 1782 to obtain limited discovery in the United States from Fenwick & West LLP ("**Fenwick**") and Morrow Sodali International LLC ("**Morrow Sodali**" or, together, the "**Respondents**") for use in the Appraisal Proceeding (the "**Application**").

4. The Petitioners, along with the other dissenting shareholders in the Appraisal Proceeding (together, the "**Dissenting Shareholders**"), were shareholders of the Company prior to the Company completing its going-private merger in September 2020 (the "**Merger**"). There

were initially 74 Dissenting Shareholders in total, which are listed in the Verified List appended to the Petition (as defined below). Since then, certain of the Dissenting Shareholders have settled their claims against the Company.

5. Each of the Dissenting Shareholders held shares in the Company as of the date of the Company's extraordinary general meeting called in connection with the Merger, and complied with the statutory requirements under Section 238 of the Cayman Islands Companies Act (2020 Revision) ("**Section 238**")—the provision for dissenting from a merger and demanding payment of the fair value of the shares.

6. The Petitioners bring this Application on behalf of all Dissenting Shareholders who remain parties to the Appraisal Proceeding. All remaining Dissenting Shareholders are aware of and support the Application. For purposes of simplicity, the Petitioners have agreed to seek this relief on behalf of all remaining Dissenting Shareholders.

7. As set forth herein, the Petitioners seek in this Application narrowly-tailored discovery relating to the valuation of the Company and the rationale for the Merger. The information sought in this Application bears directly on the issue of fair value and will assist the experts retained by the Dissenting Shareholders (including the Petitioners) and the Company, as well as the Grand Court itself, in the Appraisal Proceeding.

8. Specifically, through this Application, the Petitioners seek documents and deposition testimony from Respondents, who were played a critical role in advising the Company and the Special Committee to facilitate the Merger. Fenwick acted as legal counsel for a special committee of independent members of the 58.com board of directors tasked with considering the Merger (the "**Special Committee**"). Morrow Sodali, a shareholder engagement and governance consulting firm, acted as the proxy solicitor for the Company in this Merger.

9. My declaration, among other things, summarizes the Appraisal Proceeding upon which this Application is based and describes the limited discovery the Petitioners seek through the Application for use in the Appraisal Proceeding.

10. To the extent the contents of my declaration are within my personal knowledge, they are true and accurate. To the extent that the contents of my declaration are not within my personal knowledge, they are true to the best of my current knowledge, information, and belief.

## I.  Petitioners and Relevant Background of the Appraisal Proceeding

11. The Petitioners Four World Event Opportunities LP and Genesis Emerging Markets Investment Company are private investment funds.

12. The Petitioners, along with the other Dissenting Shareholders, were shareholders of the Company prior to the Company completing its going-private merger in September 2020. There were initially 74 Dissenting Shareholders in total, which are listed in the Verified List appended to the Petition. *See* Ex. A, Attachment (Verified List).

13. Each of the Dissenting Shareholders held shares in the Company as of the date of the Company's extraordinary general meeting called in connection with the Merger and has complied with the statutory requirements under Section 238—the provision for dissenting from a merger and demanding payment of the fair value of their shares in the Company. *See* Ex. A ¶¶ 4, 8–12.

14. Until September 17, 2020, 58.com was a publicly traded Cayman Islands corporation.

15. 58.com's American Depository Shares (**"ADS"**) first began trading on the New York Stock Exchange in 2013 and were listed under the symbol "WUBA."

16. 58.com was founded in 2005 by an individual named Jinbo Yao. Mr. Yao is both the CEO and Chairman of the Company. As of August 7, 2020 Mr. Yao—through entities affiliated with and controlled by him—controlled 44.02% of the total voting power of the Company's outstanding shares. *See* Ex. B, August 2020 Proxy Statement, at ii.

17. Additionally, other principal shareholders of the Company, including Tencent Holdings Ltd., a Chinese technology conglomerate (**"Tencent"**), which are said to have collectively controlled over 28.26% of the voting shares of 58.com, agreed to rollover rights in the transaction pursuant to which, unlike all other shareholders, they would continue to enjoy equity

rights in the surviving (private) company (collectively the **"Rollover Shareholders,"** discussed further below). *Id.*

18. According to the Proxy Statement, Mr. Yao and the Rollover Shareholders controlled over 72% of the voting power of the Company, which was sufficient, without support from any other shareholders, to pass a special resolution of the shareholders to approve the Merger (a two-third majority was required to approve the transaction). *Id.*

## II. The Merger

19. On June 15, 2020, the Company announced that it had entered into a merger agreement (the **"Merger Agreement"**) through which 58.com would be acquired and taken private by a consortium of buyers (the **"Buyer Group"**). Ex. A ¶ 5.

20. The Buyer Group was led by Mr. Yao, and included funds owned and controlled by Warburg Pincus LLC and General Atlantic LLC—two New York-based private equity firms—along with Ocean Link Partners L.P., a China-based private equity firm. Ex. B at 40–41. The Buyer Group collectively controlled over 44% of the Company's voting shares as of August 7, 2020. *Id.*

21. The Merger announcement stated that on the effective date of the Merger, the Company's publicly traded ADS would be cancelled in exchange for the right to receive $56 per ADS (the **"Merger Consideration"**). Ex. A ¶ 5. Following the Merger, all shares of 58.com would be beneficially owned in a new privately held company (the **"Surviving Company"**) owned by Mr. Yao and various funds and companies controlled by the Buyer Group and the Rollover Shareholders (described below). Ex. B at 8.

22. The private equity firms included in the Buyer Group contributed approximately $2.95 billion toward the $5.85 billion it would cost to take 58.com private, based on a price per ADS of $56. The remaining cost was to be financed by bank debt and cash on the Company's balance sheet. *Id.* at 32. The Merger was underwritten by Shanghai Pudong Development Bank Co., Ltd. (**"Shanghai Pudong Development Bank"**). *Id.* at 9.

23. It was agreed under the terms of the Merger that shares held by the Rollover Shareholders, who controlled 28.26% of the Company's voting shares, would not be cashed out in exchange for the Merger Consideration. Rather, shares held by the Rollover Shareholders would be converted into shares in the Surviving Company. *Id.* This was agreed to in June 2020, after Tencent (which itself owned 22.4% of the Company's shares) declined to join the Buyer Group and began negotiating to become a Rollover Shareholder. *Id.* at 31. Tencent eventually agreed to terms upon which it would become a Rollover Shareholder, *i.e.*, continue to be an owner of the Surviving Company. *Id.* at 32.

24. On March 24, 2020, the Company engaged Kaihui Limited ("**KL**") as its consultant to explore strategic transactions. *Id.* at 26. On April 2, 2020, KL contacted Ocean Link; that evening, Ocean Link submitted a proposal to acquire all the outstanding shares of the Company at $55 per share. *Id.* The Company decided to create a Special Committee of independent members of the board of directors, which would be tasked with considering the Merger. *Id.* at 27. At the time, there were no independent board members. The Company appointed two new members of the board: Li (Lily) Dong and Robert Frank Dodds, Jr. who, together, comprised the entire Special Committee. *Id.*

25. Ms. Dong and Mr. Dodds were appointed after the resignation of Frank Lin, an independent director of the Company with a ten-year tenure.[1]

26. On April 27, 2020, the Special Committee approved the engagement of Houlihan Lokey (China) Limited ("**Houlihan Limited**") as its financial advisor. Ex. B at 28. On May 8, 2020, at the request of the Special Committee, the Company began preparing updated financial projections "for use by [Houlihan] in connection with its financial analysis." *Id.* at 29. On May 21, 2020, the Special Committee declined to conduct either a "market check"—that is, contacting

---

[1] Securities Exchange Commission, Form 6-K (Apr. 14, 2020), https://www.sec.gov/ Archives/edgar/data/1525494/000110465920046112/tm2015729dl_6k.htm ("58.com has appointed Ms. Lily Li Dong and Mr. Robert Frank (Bob) Dodds, Jr. as independent directors, effective on April 13, 2020 . . . . Frank Lin has tendered his resignation as a director on the Board and a member of all the committees of the Board . . . . [Lin] has been on the board since 2010.").

entities that may potentially wish to also bid for control of 58.com—or insist on negotiations with the Buyer Group for the right to conduct a "go-shop," a procedure by which 58.com would be permitted to solicit competing bids. *Id.* at 30.

27. Ultimately, the Special Committee and the Buyer Group agreed to a purchase price of $56 per share after removing the requirement that the transaction be approved by a majority of the minority shareholders (the **"MoM Condition"**). *Id.* at 43. From the first Ocean Link proposal on April 2 to the final agreement on purchase price on June 15, the negotiation process took 74 days, and the price negotiation lasted 10 days. *Id.* at 26, 35.

28. On September 7, 2020, the Company held an extraordinary general meeting of shareholders (the **"EGM"**), at which time 58.com shareholders voted on whether to approve the Merger. Ex. A ¶ 6. At the EGM, less than 15% of all shareholders that were unaffiliated with either the Buyer Group or Tencent voted in favour of the Merger. Despite this lack of support from minority shareholders, the Merger was approved by over 75% of the total votes that were cast (above the required two-thirds of votes), given the votes of the Buyer Group and Tencent's abstention.[2]

29. The Merger was not subject to a majority-of-the-minority vote and the shares of all remaining 58.com stockholders—other than members of the Buyer Group and the Rollover Shareholders—were consequently cashed out with effect from September 17, 2020.[3]

30. Accordingly, the Buyer Group and the Rollover Shareholders continued to be shareholders in the Surviving Company and the Company, as the Surviving Company, has continued its operations under the name "58.com Inc." as a privately held company, beneficially owned by the Buyer Group and the Rollover Shareholders. Ex. B at 4.

---

[2] Press Release (Sept. 7, 2020), https://www.sec.gov/Archives/edgar/data/1525494/000110465920102773/tm2030344d1_ex99-1.htm.
[3] *Id.*

31. In August and September 2020, the Dissenting Shareholders exercised their Section 238 dissenters' rights and delivered to the Company written objections to the Merger and notices of their decision to dissent from the Merger. Ex. A ¶¶ 8–10.

### III. The Appraisal Proceeding

32. In accordance with Section 238, subsequent to notices of dissent being presented to it, 58.com commenced the Appraisal Proceeding on November 10, 2020, by filing a petition in the Grand Court of the Cayman Islands. Ex. A.

33. In a Section 238 appraisal proceeding, the Grand Court is under a statutory obligation to determine the fair value of the Dissenting Shareholders' shares. *See* Ex. A ¶ 12. In determining the fair value of the Dissenting Shareholders' shares, the Grand Court will examine the process that led to the Merger.

34. The Petitioners and the Dissenting Shareholders will assert in the Appraisal Proceeding that the Merger Consideration significantly undervalued the Dissenting Shareholders' shares. The Petitioners and the Dissenting Shareholders will ask the Grand Court to consider that on January 16, 2020—immediately before the initial market decline associated with the pandemic—58.com's NYSE-listed ADS closed in excess of $69 per share, *i.e.*, well above the proposed buyout price of $56 per share (although the Dissenting Shareholders do not concede that market price is a reliable indicator of fair value).

35. The Petitioners and the Dissenting Shareholders will also assert in the Appraisal Proceeding that the Merger process was fundamentally flawed. In doing so, the Grand Court will be invited to consider, among other things:

> (a) Why the Merger did not contain a MoM Condition to protect 58.com's minority shareholders. The Company's Special Committee tasked with negotiating the sale of the Company agreed to waive the MoM Condition in exchange for a mere $1 increase in the proposed purchase price—from $55 to $56 dollars—and the removal of a cap on the percentage of shareholders exercising dissent rights. Ex. B at 26. A MoM Condition would have

            required the proposed transaction to be approved by a majority of shares held by shareholders who were *not* a part of the Buyer Group or Rollover Shareholders. As discussed above, the Buyer Group and the Rollover Shareholders collectively controlled over 72% of the Company's voting power.

(b)     Whether there was a proper competitive sales process. It is likely to be relevant to that exercise how many of the Company's shares the Buyer Group controlled, and what, if any, additional measures the Special Committee took to ensure an appropriate process was in place to maximize value for shareholders. *Id.* at 30.

(c)     Why the Merger was structured such that all shares *other than* those held by the Buyer Group and the Rollover Shareholders were cashed out through the Merger.

(d)     The fact that the Merger appears to have been essentially a management buyout of 58.com and the likely effect, if any, on the Merger Consideration of the inequality of relevant financial projections and other information held by the Company and Buyer Group on the one hand, and the minority shareholders on the other.

      36.     The Petitioners and the Dissenting Shareholders will also assert that the Merger proposal contained anti-competitive terms that all but guaranteed that the Buyer Group would be successful. For example, under the terms of the Merger Agreement, in the event the Company received an alternative bid of greater value (a **"Superior Proposal"**), the Buyer Group had unlimited match rights. *Id.* at 107. To be able to accept a Superior Proposal, the Company and the board must have (i) complied with the "no shop" obligations of the Merger Agreement; (ii) provided the Buyer with an opportunity to match or exceed the competing bid; and (iii) permitted the Buyer Group to make a presentation of its modifications to the original terms. Further, if the

Company chose to accept a Superior Proposal, it was required to pay a termination fee of $126,400,000. *Id.* at 108, 115.

## IV.  Petitioners' Requested Discovery in Aid of the Appraisal Proceeding

37.     The Petitioners seek narrowly-tailored discovery for use in the Appraisal Proceeding concerning the valuation of the Company and the rationale for the Merger. Specifically, the Petitioners seek documents and testimony from Respondents concerning the process that led 58.com's Special Committee and the Board to approve the Merger.

38.     The information sought in this Application is relevant to the question of the fair value of the Dissenting Shareholders' shares and will assist the experts retained by the Dissenting Shareholders (including the Petitioners) and the Company, as well as the Grand Court itself, to determine the fair value of the Company's shares.

39.     Neither Fenwick nor Morrow Sodali is a party to the Appraisal Proceeding.

40.     The Petitioners' Application seeks evidence that will be used by experts retained by the Dissenting Shareholders (including the Petitioners) and the Company, as well as the Grand Court itself in the Appraisal Proceeding.

## V.  Current Status of the Appraisal Proceeding

41.     The Requested Discovery will be used by the experts retained by the Dissenting Shareholders (including the Petitioners) and the Company to prepare their respective reports for use by the Grand Court. The deadline for Petitioners to submit factual evidence to the Cayman court is November 23rd, 2022.

42.     I declare under penalty of perjury that the foregoing is true and correct. Executed on July 11th, 2022 at Grand Cayman, Cayman Islands.

_____
MARC KISH